**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, | x : : : |
| Plaintiff, | : : |
| v. | : : |
| HAPAG-LLOYD AG, OVERSEAS CONTAINER LINE, LTD., and UNITED STATES MARITIME ALLIANCE, LTD., | : : : : |
| Defendants. | : : x |

**Case No.**
**2:21-cv-10740 (SDW)(JBC)**

**MEMORANDUM OF LAW OF DEFENDANT UNITED STATES MARITIME ALLIANCE, LTD. IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**

James R. Campbell
The Lambos Firm, LLP
303 South Broadway, Suite 410
Tarrytown, New York 10591
Tel. (212) 943-2470
Fax (212) 797-9213
jrcampbell@lambosfirm.com

*Counsel to Defendant United States Maritime Alliance, Ltd.*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................2
    The Parties .........................................................................................................2
    The South Carolina Dispute .............................................................................3
    The NLRB Proceeding......................................................................................3
    The State-Court Action ....................................................................................4
    The Amended Complaint..................................................................................5
    The Master Contract's Grievance-And-Arbitration Procedure.......................11
    The Ramifications of the State-Court Action .................................................12

ARGUMENT .............................................................................................................14

    I.   STANDARD OF REVIEW ..........................................................................14

    II.  PLAINTIFF'S STATE-LAW CLAIMS ARE PREEMPTED BY LMRA § 301 ...........................15

    III. THE ILA WAS REQUIRED TO ARBITRATE ITS DISPUTE WITH USMX...........................18

CONCLUSION ..........................................................................................................21

i

# TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985) ...........................................16, 19, 20

*Ashcroft v. Iqbal*, 556 U.S. 652 (2009) ...........................................................................15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................15

*Bergen Reg'l Med. Ctr., L.P. v. Health Prof'ls,* Case No. 05-2596,
  2005 WL 3216549 (D.N.J. Nov. 29, 2005) ...............................................................14

*Carluccio v. Parsons Inspection & Maint. Corp.*, Case No. 06-4354 (JLL),
  2007 WL 1231758 (D.N.J. April 24, 2007)...........................................................14, 15

*Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987)...........................................................16

*Lees v. Munich Reinsurance Am., Inc.*, Civil Action No. 14-2532 (MAS)(TJB),
  2015 WL 1021299 (D.N.J. Mar. 9, 2015).................................................................15

*Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988).............................16, 19

*Myers v. AK Steel Corp.*, 156 F. App'x 528 (3d Cir. 2005) .................................14, 15

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008).........................................15

*Paperworkers v. Misco, Inc.*, 484 U.S. 29 (1987) .......................................................19

*Pryor v. NCAA*, 288 F.3d 548 (3d Cir. 2002) .............................................................15

*Republic Steel Corp. v. Maddox*, 379 U.S. 650 (1965).............................................19, 20

*Sisco v. Consol. Rail Corp.*, 732 F.2d 1188 (3d Cir. 1984) .......................................20

*Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564 (1960).................................................18

*Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574 (1960).............................18, 19

*Teamsters Local 174 v. Lucas Flour Co.*, 369 U.S. 95 (1962) ...............................16, 18

*Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448 (1957).....................19, 20

FEDERAL STATUTES

28 U.S.C.A. § 1367 (West 2019) ................................................................................17

29 U.S.C.A. § 152 (West 2018) ..................................................................................2

29 U.S.C.A. § 158 (West 2018) ......................................................................2, 12, 13

29 U.S.C.A. § 160 (West 2018) ..................................................................................4

29 U.S.C.A. § 173 (West 2018) ................................................................................18

29 U.S.C.A. § 185 (West 2018) ....................................................................2, 11, 16

**FEDERAL RULES OF CIVIL PROCEDURE**

FED. R. CIV. P. 12 ...............................................................................................14, 15

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, | x : : | |
| Plaintiff, | : : | **Case No.** **2:21-cv-10740 (SDW)(JBC)** |
| v. | : : | |
| HAPAG-LLOYD AG, OVERSEAS CONTAINER LINE, LTD., and UNITED STATES MARITIME ALLIANCE, LTD., | : : : : | |
| Defendants. | : x | |

## MEMORANDUM OF LAW OF DEFENDANT UNITED STATES MARITIME ALLIANCE, LTD. IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

### INTRODUCTION

Just a few weeks after Plaintiff International Longshoremen's Association (ILA) had assured the National Labor Relations Board (NLRB) in writing that it would not take action to enforce its interpretation of the provisions of a collective bargaining agreement with Defendant United States Maritime Alliance, Ltd. (USMX), known as the Master Contract, pending the outcome of a hearing before the NLRB, the ILA commenced an action in the Superior Court of New Jersey seeking $200 million in purported damages from USMX and one of its carrier-members, Defendant Hapag-Lloyd AG (Hapag-Lloyd), after a Hapag-Lloyd vessel called at a new marine terminal 700 miles away in South Carolina. The complaint in that action was amended less than a week later to seek $300 million, when a second carrier-member of USMX, Orient Overseas Container Line (OOCL), called at that marine terminal.

The ILA claims that the work-jurisdiction provisions of the Master Contract entitle its members to work certain jobs that ILA members do not perform in the South Carolina port. Rather

1

than filing a grievance to arbitrate the dispute, as it is required to do under the Master Contract's grievance-and-arbitration provisions, the ILA filed this meritless action seeking to intimidate USMX and its carrier-members and pressure them from calling at the new marine terminal.  The ILA's action, which constitutes an unfair labor practice under Section 8(e) of the National Labor Relations Act (NLRA), 29 U.S.C.A. § 158(e) (West 2018), must be dismissed in its entirety in accordance with Section 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C.A. § 185(a) (West 2018).

**BACKGROUND**

**The Parties**

USMX is the multiemployer collective bargaining representative of its members, which are marine-terminal operators, ocean carriers, stevedoring companies, and port associations operating on the Atlantic and Gulf Coasts of the United States.  USMX and the ILA negotiate and administer the Master Contract on behalf of USMX's member-companies, including Hapag-Lloyd and OOCL, and the ILA's affiliated locals from Maine to Texas.  The Master Contract establishes the key terms and conditions of employment for longshore workers that apply uniformly in all Master Contract ports on the Atlantic and Gulf Coasts of the United States, including the Port of New York and New Jersey (NY-NJ Port) and the Port of Charleston, South Carolina (SC Port).  *See* Notice of Removal at ¶¶ 1-3, ECF No. 1 (May 5, 2021).  The ILA is a labor organization within the meaning of LMRA § 2(5), 29 U.S.C.A. § 152(5) (West 2018), which represents longshore workers employed by the members of USMX in ports on the Atlantic and Gulf Coasts, including the NY-NJ Port and the SC Port.  *See* Notice of Removal, Exh. B at ¶ 1.

**The South Carolina Dispute**

The South Carolina Ports Authority (SCPA) operates the North Charleston Terminal (NCT) and Wando Welch Terminal (WWT) in the SC Port.  At both NCT and WWT, state employees operate the ship-to-shore cranes and perform certain other related work in the SC Port. In most of the other Master Contract ports that work is performed by members of the ILA. Charleston Stevedoring Company, LLC (CSC), a member of USMX and a tenant of the SCPA, performs certain other work at those terminals and in doing so employs members of the ILA's affiliated locals in the SC Port.  *See* Certification of David F. Adam dated May 12, 2021 (Adam Cert. at ¶ 2.

On April 9, 2021, SCPA opened a new terminal, the Hugh K. Leatherman Terminal (Leatherman), in the SC Port.  The ILA and its affiliated locals in the SC Port seek to perform all of the work performed at Leatherman, including the work that is performed by state employees at NCT and WWT, and over which CSC has no authority to control the assignment of work.  Instead, the SCPA, as is its right, has continued to maintain at Leatherman the allocation of labor maintained at NCT and WWT.  *See* Adam Cert. at ¶ 3.

**The NLRB Proceeding**

On January 7, 2021, the State of South Carolina and the SCPA filed charges before the NLRB against, *inter alia*, USMX and the ILA asserting that Article VII, Section 7(b) of the Master Contract violates NLRA § 8(e).  *See* Campbell Cert., Exh. A.  Article VII, Section 7(b) of the Master Contract states that

> USMX agrees to formally notify any port authority contemplating the development of or intending to develop a new container handling facility that USMX members may be prohibited from using that new facility if the work at that facility is not performed by Master Contract bargaining-unit employees.

*See* Notice of Removal, Exh. C at Art. VII, § 7(b).

Since that provision was inserted into the 2012-2018 Master Contract, USMX has stated that it must notify any port authority developing a new container-handling facility that USMX's carrier-members may be prohibited from calling at the new facility if the work at that facility is not performed by ILA employees.  Contrary to USMX's position, the ILA insists that Section 7(b) requires USMX's carrier-members to refuse to call at any new facility developed by a port authority, unless the ILA performs all of the work at that new facility, including work that the ILA has not performed.  *See* Adam Cert. at ¶ 4.

On March 17, 2021, the NLRB, Region 10, Subregion 11, filed a complaint against, *inter alia*, USMX and the ILA alleging that Article VII, Section 7(b) of the Master Contract violates NLRA § 8(e).  *See* Campbell Cert., Exh. B.  The next day, both USMX and the ILA submitted to the NLRB letters of assurance to forestall the NLRB's seeking an injunction under NLRA § 10(ℓ), 29 U.S.C.A. § 160(ℓ) (West 2018).  Both USMX and the ILA "agree[d] not to take action to enforce Article VII, Section 7(b), of the Master Contract at the Leatherman Terminal while the Section 8(e) charges are being litigated before an NLRB ALJ."  The ILA "further agree[d] that, during the term of this agreement, the work to be performed by Master Contract bargaining unit employees at the Leatherman Terminal will be identical to the work that is performed by the Master Contract bargaining unit employees at the Wando Terminal in the Port of Charleston."  *See* Campbell Cert., Exh. C.  At that time an expedited hearing before an administrative law judge (ALJ) of the NLRB was scheduled for May 4, 2021.  *See* Campbell Cert. at ¶ 3.

**The State-Court Action**

On April 22, 2021, a little more than a month after the ILA had submitted its letter of assurance to the NLRB and 12 days before the scheduled hearing before an NLRB ALJ, the ILA

4

filed an action in the Superior Court of New Jersey, Law Division, Essex County, Case No. ESX-L-003231-21, alleging that USMX and Hapag-Lloyd had breached the Master Contract when a Hapag-Lloyd vessel called at Leatherman.  The complaint sought damages in the amount of $200 million.  *See* Notice of Removal, Exh. A.  Four days later, the ILA filed an amended complaint in the state-court action, adding OOCL as a defendant after an OOCL vessel called at Leatherman.  The ILA now seeks damages totaling $300 million.  *See* Notice of Removal, Exh. B.  On May 5, 2021, USMX removed the state-court action to this Court.  *See* Notice of Removal.

**The Amended Complaint**

The following provisions of the Factual Background portion of the amended complaint refer to the Master Contract and/or the ILA's interpretation of it:

> 5.      Article 1, Section 3 of the Master Contract states as follows:
>
> This Master Contract is a full and complete agreement on all Master Contract issues relating to the employment of longshore employees on container and ro-ro vessels and container and ro-ro terminals in all ports from Maine to Texas at which ships of USMX carriers and carriers that are subscribers to this Master Contract may call.
>
> 6.      The Master Contract contains provisions that describe and define the work jurisdiction of a multiemployer, multiport, coastwise bargaining unit (the Master Contract bargaining unit). These provisions grant to the bargaining unit jurisdiction over all work that employees covered by the Master Contract have historically performed on a multiemployer, multiport and coastwise basis.
>
> 7.      Specifically, the Master Contract specifies that employees covered by it have jurisdiction over longshore, checker, maintenance, and other craft work conferred on such workers by the "Containerization Agreement," a copy of which is appended to this Master Contract as "Appendix A."
>
> 8.      The Containerization Agreement defines the work jurisdiction of USMX-ILA employees and prohibits the subcontracting out of any of the work covered under the agreement.

5

9.     Section 1 of the Containerization Agreement affirms the multiemployer, multiport, coastwise jurisdiction over all container and ro/ro work traditionally performed on a coastwise basis. The Section provides that:

Management and the Carriers recognize the existing work jurisdiction of ILA employees covered by their agreements with the ILA over all container work which historically has been performed by longshoremen and all other ILA crafts at container waterfront facilities. Carriers, direct employers and their agents covered by such agreements agree to employ employees covered by their agreements to perform such work which includes, but which is not limited to:

(a) the loading and discharging of containers on and off ships

(b) the receipt of cargo

(c) the delivery of cargo

(d) the loading and discharging of cargo into and out of containers

(e) the maintenance and repair of containers

(f) the inspection of containers at waterfront facilities (TIR men).

10.     Section 2 of the "Containerization Agreement" provides: "Management, the Carriers, the direct employers and their agents shall not contract out any work covered by this agreement. Any violations of this provision shall be considered a breach of this agreement."

11.     Under Section 4 of the "Containerization Agreement," the ILA has the right to seek money damages for violations of the Agreement. The Section provides: "It is understood that the provisions of this Agreement are to be rigidly enforced in order to protect against the further reduction of the work force. Management believes that there may have been violation of work jurisdiction, of subcontracting clauses, and of this Agreement, by steamship carriers and direct employers. The parties agree that the enforcement of these provisions is especially important and that any violation of such other provisions is of the essence of the

6

Agreement. The Union shall have the right to insist that any such violations be remedied by money damages to compensate employees who have lost their work. Because of the difficulty of proving specific damages in such cases, it is agreed that, in place of any other damages, liquidated damages of $1,000.00 for each violation shall be paid to the appropriate Welfare and Pension Funds. Liquidated damages shall be imposed by the Emergency Hearing Panel described below."

12.     The Containerization Agreement was entered into in order to preserve work traditionally performed by ILA employees on a coastwise basis, including the work currently performed by ILA members at marine terminals in Newark, Elizabeth, and Bayonne, New Jersey.  Due to the loss of work threatened by containerization, this agreement was an effort by the parties to preserve work that would have been lost due to containerization.

13.     The Containerization Agreement requires Hapag-Lloyd, OOCL, and other signatory carriers to use longshore employees covered by the Master Contract to load and discharge containers on and off all container ships, and perform all other container work for signatory carriers, at any marine terminal at which signatory carrier ships call on the Atlantic and Gulf Coasts of the United States.

14.     Hapag-Lloyd, OOCL, and any other carriers bound by the Master Contract are free at any time to change which marine terminal that they bring their cargo to, so long as when a shipping carrier relocates its operations to another marine terminal on the Atlantic or Gulf Coasts of the United States it must go to a terminal that uses employees covered by the Master Contract to stevedore its vessels and perform container work related thereto.

15.     Hapag-Lloyd and OOCL and other signatory carriers are on notice of their contractual obligations which were negotiated by their representative USMX.

. . .

17.     Because this terminal is new, it is not one of the terminals recognized by the Master Contract as one of the container and ro-ro terminals "in all ports from Maine to Texas at which ships of USMX carriers and carriers that are subscribers to this Master Contract may call."

18.     The Leatherman Terminal has been under construction for years, and at various times during the past twenty-four months, the ILA has reached out to USMX for assurances that the terminal would be one where all container and ro/ro work that has been historically performed by the multiemployer, multiport coastwise Master Contract bargaining unit would continue to be performed by that bargaining unit consistent with the work jurisdiction provisions of the Master Contract.

. . .

20.     On the contrary, the information that the ILA received was that the Leatherman Terminal would hire workers who were not part of the Master Contract bargaining unit employed in various positions unloading containers from ships and handling containers in the marine terminal, instead of longshore workers in the multiemployer, multiport, coastwise Master Contract bargaining unit.

21.     Defendants were on notice that the Leatherman Terminal employed workers who were not in the Master Contract bargaining unit to unload containers from ships and handle containers in the marine terminal

22.     On or about April 9, 2021, a ship owned by Hapag-Lloyd docked at Leatherman Terminal to deliver cargo. Workers who were not in the Master Contract bargaining unit were hired at Leatherman Terminal to perform various crane and terminal work unloading containers off this ship. For example, workers who were not in the Master Contract bargaining unit performed crane work, used forklifts, and moved containers onto chassis.

23.     On or about April 24, 2021, a ship owned by OOCL docked at Leatherman Terminal to deliver cargo. Workers who were not in the Master Contract bargaining unit were hired at Leatherman Terminal to perform various crane and terminal work unloading containers off this ship. For example, workers who were not in the Master Contract bargaining unit performed crane work, used forklifts, and moved containers onto chassis.

24.     The Hapag-Lloyd and OOCL ships intentionally went to Leatherman Terminal even though they knew that workers who were not in the Master Contract bargaining unit would be hired to unload containers and to handle containers on the terminal.

. . .

8

26.     Defendants were well aware that the work in question would have been handled by members of the multiemployer, multiport, coastwise bargaining unit who are covered by the Master Contract if the ship had gone to other marine terminals on the East and Gulf Coasts of the United States, including all the marine terminals in New Jersey.

28.     Upon information and belief, Defendants' recent action presages future diversion of discretionary cargo from the Master Contract bargaining unit to workers outside the Master Contract bargaining unit specifically to avoid the cost of paying Master Contract wages and benefits.

29.     In addition, as a result of the signatory carriers' decision to call their ships to Leatherman Terminal where employees from outside the Master Contract bargaining unit performed the work within the jurisdiction of the multiemployer, multiport, coastwise Master Contract bargaining unit, the ILA suffered massive damages. ILA members lost out on work opportunities, suffering lost wages and lost benefits, thereby also depriving the ILA of dues income.

30.     In addition, these employees lost out on future wages and benefits because of the precedent set for using non-bargaining unit workers at the Leatherman Terminal and at other noncontract marine terminals on the East and Gulf Coasts.

*See* Notice of Removal, Exh. B at ¶¶ 5-15, 17-18, 20-24, 26, 28-30.

Count I of the amended complaint, entitled "Tortious Interference with Contract," states

that

33.     The Master Contract creates a protected interest for the ILA and its members in that it protects work jurisdiction whereby ILA members are able to earn wages and benefits for themselves and their families.  The ILA then is able to collect a portion of its members' wages as union dues.

34.     Defendants intentionally and maliciously interfered without justification with the ILA's protected interest by interfering with the work jurisdiction of the Master Contract bargaining unit, when the signatory carriers elected to bring their container vessels to the Leatherman Terminal in April 2021, as workers not covered by the Master Contract were hired to perform crane and terminal work

9

unloading containers and handling containers from container ships, which work historically has been performed by members of the Master Contract bargaining unit on a multiemployer, multiport, coastwise basis.

35.    Defendants' interference has caused the ILA and its members harm by depriving the ILA of dues and violating the Master Contract bargaining unit's work jurisdiction.

*See* Notice of Removal, Exh. B at ¶¶ 33 – 35.

The second count of the amended complaint, entitled "Tortious Interference with

Prospective Economic Advantage," asserts that

38.    Defendants' conduct intentionally and maliciously interfered without justification with the ILA's future ability to enter into collective bargaining agreements on behalf of its members, preserve jobs for its members in accordance with the work jurisdiction provisions of the Master Contract, and to enforce the work jurisdiction provisions of the Master Contract.

*See* Notice of Removal, Exh. B at ¶ 38.

Count III of the amended complaint, entitled "Civil Conspiracy," states that

42.    Defendant USMX acted in concert with the defendant shipping carriers in order to violate the work jurisdictions of the Master Contract and to interfere with the work jurisdiction of the Master Contract bargaining unit.

. . .

44.    This included when the defendant shipping carriers with the consent of USMX, elected to bring their container vessels to the Leatherman Terminal, knowing that workers not covered by the Master Contract would be, and were, hired to perform crane and terminal work unloading containers and handling containers from the ships, which work historically has been performed by members of the Master Contract bargaining unit on a multiemployer, multiport, coastwise basis.

*See* Notice of Removal, Exh. B at ¶¶ 42, 44.

The fourth count of the amended complaint, entitled "Breach of the Master Contract," asserts that

> 47.    Section 301(a) of the LMRA allows labor organizations representing employees in an industry affecting commerce to sue for violations of a collective bargaining agreement with an employer. 29 U.S.C. §185 (a).
>
> 48.    Pursuant to the terms of the Containerization Agreement in the Master Contract, Defendants are contractually obligated to use employees covered by the Master Contract to perform the container work which historically has been performed by longshoremen and all other ILA crafts at container waterfront facilities.
>
> 49.    Defendants willfully violated the work jurisdiction provisions of the Master Contract, when the defendant shipping carriers elected to bring their container vessels to the Leatherman Terminal, as workers not covered by the Master Contract were hired to perform crane and terminal work unloading containers and handling containers which historically has been performed by members of the Master Contract bargaining unit on a multiemployer, multiport, coastwise basis.
>
> 50.    As a result of Defendants' breach of the Master Contract, Defendants breached the Master Contract.

*See* Notice of Removal, Exh. B at ¶¶ 47 – 50.

**The Master Contract's Grievance-And-Arbitration Procedure**

The Master Contract contains a detailed grievance-and-arbitration mechanism.  *See* Notice of Removal at ¶ 8, Exh. C at Art. XIV.  The grievance-and-arbitration procedures in the Master Contract govern "[a]ll disputes under th[e] Master Contract involving containerization and ro-ro, including interpretations of th[e] Master Contract."  *See* Notice of Removal at ¶ 8, Exh. C at Art. XIV, § 1.

Grievances under the Master Contract are first heard by a Local Industry Grievance Committee (LIGC), which consists of three representatives of management and three

11

representatives of the ILA.  The LIGC must issue a decision within ten days of the filing of a

grievance.  *See* Notice of Removal at ¶ 9, Exh. C at Art. XIV, § 1.

An appeal of a decision of an LIGC may be referred to the Industry Appellate Committee

(IAC).  *See* Notice of Removal at ¶ 10, Exh. C at Art. XIV, § 2.  The IAC is comprised of 16

representatives of management and 16 representatives of the ILA.  *See* Notice of Removal at ¶ 10,

Exh. C at Art. XIV, § 5(a).  The President of the ILA and the Chairman/CEO of USMX serve as

co-chairmen of the IAC.  *See* Notice of Removal at ¶ 10, Exh. C at Art. XIV, § 5(b).  Decisions of

the IAC are final and binding and constitute an enforceable award.  *See* Notice of Removal at ¶

10, Exh. C at Art. XIV, §§ 5(d), (e).

The Master Contract provides for arbitration in the event of an IAC deadlock.  *See* Notice

of Removal at ¶ 11, Exh. C at Art. XIV, § 6(b).  The Master Contract also provides for expedited

arbitration.

> Any party to th[e] Master Contract may, with respect to any
> grievance, dispute, complaint, or claim arising out of or relating to
> the Master Contract at any point waive any and all preliminary steps
> of the grievance machinery and submit the matter to arbitration
> ("expedited arbitration") at any time after a matter has been
> considered by the Co-Chairmen.

*See* Notice of Removal at ¶ 11, Exh. C at Art. XIV, § 6(d).

At no time has the ILA sought to use the grievance-and-arbitration provisions of the Master

Contract to grieve the dispute that is the subject of the amended complaint.  *See* Adam Cert. at

¶ 5.

**The Ramifications of the State-Court Action**

Three days after the ILA commenced the state-court action, USMX filed a charge with the

NLRB under NLRA §§ 8(b)(4)(ii)(A) and 8(b)(4)(ii)(B), 29 U.S.C.A. §§ 158(b)(4)(ii)(A), (B)

(West 2018), asserting that the filing of that action was an attempt to threaten, coerce, or restrain

USMX and its members with the object of (1) forcing or requiring USMX and its members to enter into an agreement that is prohibited by NLRA § 8(e), 29 U.S.C.A. 158(e) (West 2018), and (2) forcing or requiring USMX and its members to cease utilizing and cease doing business at Leatherman.  *See* Campbell Cert., Exh. E.  Shortly thereafter the NLRB adjourned the hearing scheduled for May 4, 2021.  That hearing has now been scheduled for June 9, 2021.  *See* Campbell Cert. at ¶ 4.

As stated above, after an OOCL vessel called at Leatherman, the ILA filed an amended complaint in this action, adding OOCL as a defendant.  *See supra* at 5.  After OOCL was named as a defendant, other carrier-members of USMX have requested and have received permission from SCPA to call at WWT, rather than Leatherman, so they would not become parties to this action and subject to the ILA's extortionate demands.  *See* Adam Cert. at ¶ 6.  During the next few weeks, only two vessels, both operated by Hapag-Lloyd, are scheduled to call at Leatherman, while 40 vessels are scheduled to call at WWT.  *See* Campbell Cert., Exh. D (ILA Lawsuit Throttles South Carolina Container Terminal Traffic, https://www.hellenicshippingnews-com/ila-lawsuit-throttles-south-carolina-terminal-traf-fic/, May 10, 2021).

The SCPA in a statement to the media has said,

- "It is certainly understandable that major foreign container shipping companies do not wish to be confronted with frivolous lawsuits and are not at all used to this behavior."

- "These issues should have been professionally addressed through the pending NLRB proceeding or the arbitration clause that exists in the 'master contract' between the shipping lines and the longshoremen union, but unfortunately, the union has engaged in illegal, unfair, and deceptive practices to intimidate – successfully – certain shipping lines to try to leverage the unionization of state employees."

- "[T]hese lines are being intimidated to either return to Wando Terminal or divert these vessels to other South Atlantic ports, which have the same operating model that they are objecting to here."

13

- "The lawsuit is a clear intimidation tactic targeting the shipping line customers of S.C. Ports Authority, all of whom are members of the USMX and agreed to utilize Leatherman Terminal, pending the outcome of the NLRB proceeding."

- Switching back to WWT "is not a sustainable solution, but in the short-term, it will help mitigate the harm caused by the unlawful union tactics and assure the continuity of service to which our customers have become acquainted while further protections are sought through the legal process."

*See* Campbell Cert., Exh. D (Two Container Alliances Switch Charleston Port Calls Due to ILA

Lawsuit Threat, https://www.joc.com/port-news/us-ports/port-charleston/two-container-alliances-

switch-charles-ton-port-calls-due-ila-lawsuit-threat_20210505.html, May 5, 2021); *see also*

Campbell Cert., Exh. D (ILA Lawsuit Throttles South Carolina Container Terminal Traffic,

https://www.hellenicshippingnews.com/ila-lawsuit-throttles-south-carolina-terminal-traffic/, May

10, 2021).[1]

## ARGUMENT

## I.

## STANDARD OF REVIEW

The appropriate standard of review for determining whether a complaint should be

dismissed due to preemption under LMRA § 301 is Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  *See Carluccio v. Parsons Inspection & Maint. Corp.*, Case No. 06-4354 (JLL), 2007

WL 1231758, at *2 (D.N.J. April 24, 2007); *Bergen Reg'l Med. Ctr., L.P. v. Health Prof'ls*, Case

No. 05-2596, 2005 WL 3216549, at *2 (D.N.J. Nov. 29, 2005); *see also Myers v. AK Steel Corp.*,

---

[1] The ILA's strongarm tactics have been felt outside South Carolina as well.  The Georgia Ports Authority, which employs state employees and ILA members in a manner similar to the SCPA, announced on April 26, 2021, that it would be postponing the construction of a new terminal.  *See* Campbell Cert., Exh. D (Peter Tirschwell, Longshore Labor Pressure Building Across North America, https://www.joc.com/port-news/longshore-labor-pressure-building-across-north-america_20210-504.html, May 4, 2021).

156 F. App'x 528, 529-30 (3d Cir. 2005).  To survive a motion to dismiss under Rule 12(b)(6), a challenged pleading must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A pleading that offers "labels and conclusions" or "a formalistic recitation of the elements of a cause of action will not do."  *See Twombly*, 550 U.S. at 555.  When addressing a motion to dismiss, a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

"Documents that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim; as such, they may be considered by the court."  *Pryor* v. *NCAA*, 288 F.3d 548, 560 (3d Cir. 2002); *see also Lees v. Munich Reinsurance Am., Inc.*, Civil Action No. 14-2532 (MAS)(TJB), 2015 WL 1021299, at *2 (D.N.J. Mar. 9, 2015).

## II.

### PLAINTIFF'S STATE-LAW CLAIMS ARE PREEMPTED BY LMRA § 301

LMRA § 301(a) states that

> [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C.A. § 185(a).   The application of federal law to claims arising out of a collective bargaining agreement prevents varying interpretations of that agreement and fosters "the congressional goal of a unified federal body of labor-contract law."   *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985).

> The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.  Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract.  Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation.

*Teamsters Local 174 v. Lucas Flour Co.*, 369 U.S. 95, 103-04 (1962); *see also Lueck*, 471 U.S. at 211.  The concern of having different interpretations of contract provisions under different systems of law is especially relevant for a collective bargaining agreement, like the Master Contract, that covers workers in 15 states.

LMRA § 301 preempts a state-law claim "if the resolution of [that] state-law claim depends upon the meaning of a collective-bargaining agreement," *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988), is "founded directly on rights created by collective-bargaining agreements, [or is] 'substantially dependent on [an] analysis of a collective-bargaining agreement.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987); *Lueck*, 471 U.S. at 220. There is no question that the claims in the ILA's amended complaint are dependent upon the terms of the Master Contract.  Indeed, "Master Contract" appears in the amended complaint 52 times and is referred to in 36 of its 51 paragraphs.  *See* Notice of Removal, Exh. B at ¶¶ 1-15, 17-18, 20-24, 26-30, 33-35, 38, 42, 44, 48-50.

All four counts of the amended complaint allege a violation of the work-jurisdiction provisions of the Master Contract.  The first count asserts that defendants have tortiously interfered with the Master Contract and the protected interests that it creates for ILA members to perform work covered by the Master Contract.  According to the ILA, defendants have violated the work-jurisdiction provisions of the Master Contract by allowing non-ILA workers to perform crane and terminal work at Leatherman.  *See* Notice of Removal, Exh. B at ¶¶ 33-36.  Count II alleges that defendants have interfered with the ILA's ability to enter into collective bargaining agreements, preserve jobs for its members under the work-jurisdiction provisions of the Master Contract, and enforce the work-jurisdiction provisions of the Master Contract.  *See* Notice of Removal, Exh. B at ¶ 38.  The third count states that defendants have acted in concert to violate the work-jurisdiction provisions of the Master Contract by allowing non-ILA workers to perform crane and terminal work at Leatherman.  *See* Notice of Removal, Exh. B at ¶¶ 42, 44.  The fourth count states that defendants have breached the work-jurisdiction provisions of the Master Contract by allowing non-ILA workers to perform crane and terminal work at Leatherman.  *See* Notice of Removal, Exh. B at ¶¶ 48-49.

Only the fourth count, which specifically cites LMRA § 301(a), is brought under federal law.  *See* Notice of Removal, Exh. B at ¶ 47.  Since the first three counts depend upon an interpretation of provisions of the Master Contract, they are preempted by LMRA § 301(a) and must be dismissed.[2]

---

[2]  To the extent the state-law claims may not be preempted, which they are, this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C.A. § 1367(a) (West 2019) because they form part of the same case or controversy as the claim alleged in the fourth count, that is, all four claims stem from the defendants' alleged breach of the Master Contract.

### III.

#### THE ILA WAS REQUIRED TO ARBITRATE
#### ITS DISPUTE WITH USMX

LMRA § 203(d), 29 U.S.C.A. § 173(d) (West 2018), states that

> [f]inal adjustment by a method agreed upon by the parties is hereby
> declared to be the desirable method for settlement of grievance
> disputes arising over the application or interpretation of an existing
> collective-bargaining agreement . . . .

The policy established by LMRA § 203(d) can only be given shape if the method chosen by the

collective-bargaining parties for the resolution of their disputes is enforced.  *See Steelworkers v.*

*Am. Mfg. Co.*, 363 U.S. 564, 566 (1960).  To that end, the Master Contract includes a detailed

grievance-and-arbitration mechanism.  That mechanism has been established by USMX and the

ILA to resolve "[a]ll disputes under th[e] Master Contract involving containerization and ro-ro,

including interpretations of th[e] Master Contract . . . ."  *See supra* at 11.

Under the Master Contract, a grievance can be filed and heard by a committee comprised

of representatives of labor and management from the port in which the dispute arises, known as

the LIGC.  If the dispute is not resolved by the LIGC, the Master Contract provides for an appeal

to a larger committee also comprised of representatives of labor and management, known as the

IAC.  If the IAC is unable to resolve the dispute, the matter may be referred to arbitration.

Alternatively, the President of the ILA or the Chairman/CEO of USMX may waive the preliminary

steps of the Master Contract's grievance procedure and refer the dispute directly to expedited

arbitration.  *See supra* at 12.

It is "the basic policy of national labor legislation to promote the arbitral process as a

substitute for economic warfare."  *Lucas Flour*, 369 U.S. at 578 (citing *Steelworkers v. Warrior &*

*Gulf Nav. Co.*, 363 U.S. 574 (1960).  Arbitration plays a central role in our "system of industrial

18

self-governance." *Lueck*, 471 U.S. at 219 (quoting *Warrior & Gulf*, 363 U.S. at 581); *Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448, 455 (1957) (enforcement of agreements to arbitrate is the best way to ensure industrial peace).

> [T]he grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties.  The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

*Warrior & Gulf*, 363 U.S. at 581.  Through LMRA § 301(a), Congress has assigned to the courts the responsibility of determining whether a collective-bargaining party has breached its promise to arbitrate a dispute.  But the role of the courts is limited, and any doubt as to whether the parties have agreed to arbitrate a dispute should be resolved in favor of arbitration.  *Warrior & Gulf*, 363 U.S. at 582-83.

It is blackletter law that a dispute between collective-bargaining parties must be arbitrated before an action is commenced in court.  *Lueck*, 471 U.S. at 219; *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987).  Allowing a collective-bargaining party to avoid contractual grievance procedures "would cause arbitration to lose most of its effectiveness, . . . as well as eviscerate a central tenet of federal labor contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance."  *Lueck*, 471 U.S. at 220; *Lingle*, 486 U.S. at 411.

The ILA had an obligation to exhaust the grievance-and-arbitration provisions of the Master Contract before filing suit in state court to enforce its interpretation of the work-jurisdiction provisions of the Master Contract.  *See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965).

The Third Circuit has only "recognized three exceptions to the exhaustion requirement: '(1) when the employer repudiates the private grievance machinery, (2) when resort to administrative remedies would be futile; and (3) when the employer is joined in a [] claim against the union' for breaching its duty of fair representation. *Sisco v. Consol. Rail Corp.*, 732 F.2d 1188, 1190 (3d Cir. 1984). None of those exceptions applies here.

Accordingly, the Master Contract's grievance-and-arbitration provisions should be specifically enforced, *see Lincoln Mills*, 353 U.S. at 451, and the complaint should be dismissed, *see Maddox*, 379 U.S. at 652; *Lueck*, 471 U.S. at 220-21.

### CONCLUSION

Plaintiff International Longshoremen's Association (ILA), ignoring the grievance-and-arbitration procedures in its collective bargaining agreement with Defendant United States Maritime Alliance, Ltd. (USMX), known as the Master Contract, commenced an action against USMX and two of its carrier-members seeking to enforce its interpretation of the work-jurisdiction provisions of the Master Contract.  Three of the four counts in the ILA's amended complaint are preempted under Section 301(a) of the Labor Management Relations Act and should be dismissed. The fourth count, which alleges a breach of the Master Contract, should be dismissed because the ILA failed to seek to resolve the dispute through the Master Contract's grievance-and-arbitration provisions.  Accordingly, the amended complaint should be dismissed in its entirety.

Dated: May 12, 2021

Respectfully submitted,

THE LAMBOS FIRM, LLP

By:   <u>     s/ James R. Campbell     </u>
James R. Campbell
303 South Broadway, Suite 410
Tarrytown, New York 10591
Tel. (212) 943-2470
Fax (212) 797-9213
jrcampbell@lambosfirm.com

*Counsel to Defendant United States Maritime Alliance, Ltd.*

*64804*

21